930 P.2d 508

**Jennifer Johnson CULPEPPER,
Plaintiff–Appellant,**

v.

**STATE of Arizona;  the Arizona State
Board of Nursing, Defendant–
Appellee.**

**No. 1 CA–CV 95–0470.**

Court of Appeals of Arizona,
Division 1, Department E.

Aug. 22, 1996.

Review Denied Jan. 14, 1997.

Friedl, Richter & Buri by Charles E. Buri, Phoenix, for Plaintiff–Appellant.

Grant Woods, Attorney General by Janet M. Walsh, Assistant Attorney General, for Defendant–Appellee.

## OPINION

THOMPSON, Judge.

Jennifer Johnson Culpepper (Culpepper) appeals from the superior court's affirmance of the Arizona State Board of Nursing's (Board) denial of her application for a professional nursing license. The Board based its denial of Culpepper's application on its determination that she had cheated on her licensing examination.

On appeal, Culpepper contends that: (1) the Board's decision was not supported by substantial evidence; (2) the Board applied the wrong standard of proof in the administrative proceeding; (3) the Board's denial of

her license application was an excessive penalty; and (4) the superior court improperly assessed costs against her in the lower court proceeding. For the reasons discussed below, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On July 7 and 8, 1993, professional nurse candidates throughout the country took the National Council Licensing Exam (NCLEX), the national licensing test for professional (registered) nurses. The exam consists of four parts and is administered over two days. Culpepper was one of 731 candidates who took the Arizona exam at the Phoenix Civic Center. One examiner, four assistant examiners and twenty-two proctors administered and monitored the exam.[1] The testing area was divided into twenty-two groups of approximately thirty-five candidates each. Culpepper was assigned to Group 5 and seated at the right end of a table with candidate T.L. Culpepper (T.L.) seated to her immediate left. Although they have the same last name, T.L. and Culpepper are not related and they did not know each other prior to the exam.

Part One of the exam was administered on the morning of July 7, 1993. Approximately forty-five minutes into the ninety minute examination, Dorothy Moore (Moore), the proctor assigned to Culpepper's group, noticed suspicious behavior by Culpepper. Moore saw Culpepper move her body and chair to the left and closer to T.L. Moore then observed Culpepper look at T.L.'s test booklet. Moore proceeded to watch Culpepper for several minutes and from different angles; Culpepper continued to turn toward T.L. on her left, return to her own test booklet and mark it. Moore then asked James Mitchell (Mitchell), one of the assistant examiners, to watch Culpepper.

Mitchell saw Culpepper engage in the same suspicious behavior observed by Moore. He saw Culpepper move her head to the left for several seconds at a time, return to her booklet and mark it. He observed Culpepper from several angles and verified that her eyes were actually focused on T.L.'s exam booklet. The two times Mitchell checked to see if Culpepper and T.L. were working on the same part of the exam, their exam booklets were opened to the same page. After concluding that Culpepper was looking at T.L.'s exam booklet, Mitchell reported the situation to Constance Connell (Connell), the examiner.

Connell went to Group 5 and observed Culpepper for several minutes. Connell also saw Culpepper look to her left at T.L.'s exam and then fill in her own answers. When Connell checked the candidates' test booklets, the booklets were opened to the same page. Connell instructed Mitchell to continue watching Culpepper during the remainder of Part One of the exam. Mitchell observed Culpepper for the rest of that part of the exam and her suspicious behavior continued.

Part Two of the exam took place in the afternoon of July 7th. When Connell learned that Culpepper's suspicious behavior had continued throughout the first part of the exam, she instructed Mitchell to sit in a chair directly in front of Culpepper during Part Two, continually monitoring her. Mitchell did so, sitting approximately six feet away from Culpepper. Mitchell continued to observe Culpepper looking to her left at T.L.'s booklet during the second part of the exam. At some point during Part Two of the exam, Connell told Culpepper to keep her eyes on her own exam and advised T.L. to cover his booklet.[2]

Parts Three and Four of the exam were administered the next day. Prior to Part Three of the exam, Connell decided to discourage cheating by Culpepper by physically

---

1. The examiner has overall responsibility for the examination—ensuring its proper administration, verifying candidates' assigned test numbers, and making arrangements for candidates with disabilities. The assistant examiners unseal and hand the test booklets to the proctors and assist with the monitoring of the candidates. The proctors are responsible for actually distributing

and collecting the examination booklets as well as monitoring particular groups of candidates throughout the exam.

2. Because T.L. is left-handed, his exam booklet was angled toward Culpepper.

separating her from the other candidates. The exam officials added another row of tables to Group 5, thereby placing Culpepper at her own table and separating her from T.L. by six to eight feet. Connell, Mitchell and Moore continued to watch Culpepper throughout Parts Three and Four of the examination but they did not observe her engage in any further suspicious behavior.

The day after the exam, Connell filed a cheating incident report regarding Culpepper's suspicious behavior with the National Council of State Nursing Boards (National Council), the body that oversees all of the member nursing boards throughout the country, and CTB McGraw–Hill (CTB), the testing service for the exam. Connell requested CTB to conduct a Cheating Analysis of Culpepper's and T.L.'s exams. In conducting this analysis, CTB analyzed four measures of test performance by Culpepper and T.L.—(1) the number of times the two candidates picked identical responses (both correct and incorrect); (2) the number of responses in the longest and second-longest strings of identical responses; (3) each candidate's performance by test booklet (*i.e.*, their performances on each part of the exam); and (4) the pattern of erasures for each candidate.

The results of the Cheating Analysis were as follows: The two candidates had 82.8% identical responses in Book One; 67.7% identical responses in Book Two; 57.0% responses in Book Three; and 52.2% identical responses in Book Four. The longest identical strings (*i.e.*, the number of identical responses in a series) were in Book One (14 items and 12 items), and to a lesser degree in Book Two (11 items and 9 items), while the shortest identical strings were in Books Three (4 items and 3 items) and Four (6 items and 4 items). Culpepper performed very well in Book One but had lower scores in the other three books, while T.L. scored consistently high throughout the exam.[3] The number of erasures for each candidate was low and therefore not conclusive. In sum, the Cheating Analysis reported more similarities be-

tween the two candidates in Books One and Two, than in Books Three and Four.

In September 1993, after the Board reviewed the cheating incident report and the results of the Cheating Analysis, it ordered CTB to conduct an additional study—the Baseline Study. The Baseline Study analyzes the probability of similar responses between Culpepper and T.L. as compared with 360,000 other pairs of candidates who obtained scores similar to Culpepper and T.L. on the exam. These "baseline candidates" are drawn from the four states that utilized the same test booklets as Arizona in the July 1993 exam. The Baseline Study was concluded in late October 1993, and the resulting report forwarded to the Board.

According to the Baseline Study, a 0% probability existed for Culpepper and T.L. to obtain 83% identical responses in Book One and "the similarities between the two candidates in Book 1 are extremely unusual." A 2.7% probability existed for Culpepper and T.L. to obtain 68% identical responses in Book Two, a finding which "displays similarities that are still unusual but not as unusual as those found in Book 1." Finally, the report concluded that "Books 3 and 4 exhibit similarities that are very common among the baseline pairs."

After considering the results of the Cheating Analysis and the Baseline Study and the eyewitnesses' observations at the exam, the Board denied Culpepper licensure as a professional nurse. Culpepper then requested a hearing on the matter.

A hearing officer conducted a three-day hearing in April 1994. Culpepper testified on her own behalf and presented several character witnesses. She also offered the expert testimony of Dr. Sanford Braver, a psychometrician and professor at Arizona State University's psychology department, who opined that the data from the Cheating Analysis and the Baseline Study was inconclusive and did not confirm cheating. Dr. Braver also criticized the methodology used in the studies, stating that it would be more telling with an easy examination like the

3. Culpepper's scores were as follows: Part One—86.0%; Part Two—64.5%; Part Three—63.2%; and Part Four—65.2%. In contrast, T.L. achieved the following scores: Part One—84.2%; Part Two—81.7%; Part Three—84.2%; and Part Four—76.1%.

NCLEX to compare the similarity of the candidates' identical wrong answers, instead of placing so much emphasis on the similarity of their identical correct responses. The state presented the eyewitness testimony of Connell, Mitchell and Moore. The state also submitted the results of the Cheating Analysis and the Baseline Study, and the testimony of four experts who verified the validity of the results and the methodology used in the studies. Dr. Robert Sykes, a research scientist for CTB, testified that both studies corroborated the eyewitnesses' observations of Culpepper's suspicious behavior during the examination. Dr. Kyoko Ito, another research scientist for CTB, testified that the Baseline Study established a pattern that would be consistent with cheating, rather than mere nervous behavior. Dr. Ellen Julian, a psychometrician for the National Council, testified that the methodology used in both studies was sound. She also stated that the results of the Cheating Analysis alone convinced her that cheating had occurred during Part One of the exam. Dr. Julian noted, however, that the safer route was to also conduct a Baseline Study and that the results of the Baseline Study in this case had confirmed the results of the Cheating Analysis. Finally, Dr. Joseph Hepworth, a research specialist for the College of Nursing at Arizona State University, concurred with Dr. Julian's opinion that the methodology and conclusions of both studies were sound. He further testified that the percentage of identical responses in Books One and Two, as reported in the Cheating Analysis, substantiated a hypothesis of cheating. He also believed that the percentage of similar responses by Culpepper and T.L. in Book One compared to the other candidates in the Baseline Study was "extremely unusual."

After considering the evidence, the hearing officer found substantial evidence that Culpepper had engaged in fraud and deceit during the exam by copying her answers from another candidate's test booklet. The hearing officer recommended that the Board

deny Culpepper's license application. The Board considered the matter at its July 21, 1994, meeting, and, on August 24, 1994, issued an order adopting the hearing officer's recommendations and affirming its denial of licensure. The Board based its denial on its conclusion that Culpepper had attempted to obtain her registered nurse's license through fraud and deceit by copying her answers from T.L.'s exam booklet in violation of Arizona Revised Statutes Annotated (A.R.S.) § 32-1663(A).[4]

Culpepper moved for a rehearing, which the Board denied. She then filed a complaint in superior court seeking judicial review of the Board's decision. The parties proceeded to thoroughly brief the matter for the court. On August 2, 1994, the court entered judgment affirming the Board's decision to deny licensure to Culpepper and awarding costs in the amount of $1,658.00 to the Board. Culpepper then timely filed this appeal. We have jurisdiction over this appeal pursuant to A.R.S. § 12-2101(B).

## ISSUES

1. Was there substantial evidence to support the Board's decision that Culpepper attempted to obtain her professional nursing license through fraud and deceit (*i.e.*, by cheating on her examination)?

2. Did the Board apply the correct standard of proof (preponderance of the evidence, rather than clear and convincing evidence) in the administrative proceeding?

3. Was the Board's denial of Culpepper's nursing license an excessive penalty?

4. Did the superior court properly assess costs against Culpepper?

## DISCUSSION

**I. There was Substantial Evidence Supporting the Board's Decision.**

■ Culpepper claims that the Board's decision was not supported by substantial evi-

---

4. This statute provides that:
   [t]he board may deny any license applied for under this chapter if the applicant commits an act of unprofessional conduct.
   A.R.S. § 32-1663(A).

Another statutory provision states that an individual has committed "unprofessional conduct" if he or she has committed "fraud or deceit in obtaining, attempting to obtain or renewing a license." A.R.S. § 32-1601(10)(a).

dence. In reviewing factual determinations by an administrative agency, this court does not reweigh the evidence or substitute its judgment for that of the agency. *Outdoor Systems, Inc. v. Arizona Dept. of Transp.,* 171 Ariz. 263, 264, 830 P.2d 475, 476 (App. 1992); *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Products, Inc.,* 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App. 1990). Instead, we determine whether "substantial evidence" exists in the record to support the factual findings of the agency. *Havasu Heights,* 167 Ariz. at 387, 807 P.2d at 1123.

Throughout the administrative and judicial proceedings, Culpepper has maintained her innocence and argued that exam officials mistook her nervous test-taking behavior for cheating. She contends that the evidence does not support the Board's decision because: (1) none of the eyewitnesses could *definitively* testify that she was copying from T.L.'s exam; (2) the statistical analyses do not *conclusively* establish that she was cheating; (3) cheating would be out-of-character for her and unnecessary given her own knowledge of the material; and (4) she would not copy answers from someone she did not know.

■ We find that substantial evidence supported the Board's findings regarding Culpepper's conduct and her violations of the pertinent statutes. The state presented the testimony of three exam officials who witnessed suspicious behavior by Culpepper indicative of cheating. Although none of the eyewitnesses could testify that Culpepper was *definitely* copying answers from T.L.'s exam booklet, they described behavior which certainly gave that appearance—Culpepper constantly moving toward T.L., looking to her left at T.L.'s paper, then marking her own answers.[5] Mitchell even observed Culpepper from various angles to verify that her eyes were falling on T.L.'s exam. Further, the eyewitnesses' testimony was corroborated by the results of the Cheating Analysis

and Baseline Study, both of which indicated that Culpepper had cheated on Part One of the examination and, to a lesser degree, on Part Two of the examination. The state also offered the testimony of four experts who verified the methodology and results of the above studies. While any of these items may not be conclusive by itself, in combination the evidence supported the Board's determination that Culpepper was cheating during Part One (and possibly Part Two) of the exam.

Culpepper contends that Dr. Braver's testimony effectively invalidated the Cheating Analysis and Baseline Study. Dr. Braver testified that these studies on their own could not conclusively establish cheating. However, he also acknowledged that the analyses did not rule out cheating—they were just inconclusive. Furthermore, the state's four experts challenged Dr. Braver's opinion, testifying that the analyses did establish cheating, especially in light of the eyewitnesses' testimony.

■ Culpepper also relies on Dr. Braver's testimony discounting certain methodology used in the studies. Again, the state's experts refuted this testimony, particularly Drs. Julian and Hepworth who both opined that the methodology used in the studies was sound. With regard to Culpepper's claims regarding the conflicting expert testimony and her own protestations of innocence, we note that it is the Board's prerogative, as the trier-of-fact, to assess the credibility of witnesses. *Anamax Mining Co. v. Arizona Dept. Econ. Sec.,* 147 Ariz. 482, 486, 711 P.2d 621, 625 (App.1985). After reviewing the administrative record, we find that substantial evidence supported the Board's finding that Culpepper cheated on her exam.

## II. The Board Applied the Correct Standard of Proof in the Administrative Proceedings.

Culpepper asserts that the Board applied the improper standard of proof in the admin-

---

**5.** Culpepper also contends that the allegations of cheating are refuted by the fact that T.L. finished and handed-in each section of the exam ahead of her. As a result, she claims that she could not have been cheating from his exam because he was probably working ahead of her and on a different page throughout most of the test. However, each time Mitchell and Connell checked to see if T.L. and Culpepper were working on the same part of the exam, the candidates' exam booklets were open to the same page.

istrative proceeding. She contends that where allegations of fraud are at issue, the applicant's misconduct must be shown by clear and convincing evidence—not by a mere preponderance of the evidence standard applied by the Board.[6]

Although no Arizona case has addressed the standard of proof required for hearings conducted pursuant to the Administrative Procedure Act (APA), A.R.S. §§ 41–1061 to – 1066, the United States Supreme Court has considered the issue in a proceeding conducted pursuant to the Federal APA, 5 U.S.C. § 551 *et seq. See Steadman v. Securities and Exch. Comm'n*, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). In *Steadman*, the Court reviewed the Securities and Exchange Commission's (SEC) use of a preponderance of the evidence standard in an administrative proceeding determining whether the petitioner, Steadman, had violated antifraud provisions of the federal securities laws. Like Culpepper, Steadman argued that because fraud allegations and potentially severe sanctions were at issue, the SEC was required to weigh the evidence against a clear and convincing standard of proof. The Supreme Court rejected this argument, concluding that such proceedings are governed by a preponderance of the evidence standard. *Id.* at 103, 101 S.Ct. at 1009.

In reaching this conclusion, the Court looked to § 556(d) of the Federal APA which provides:

> [a] sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the *reliable, probative, and substantial evidence.*

5 U.S.C. § 556(d) (emphasis added). The Court interpreted the term "substantial evidence" to refer to a quantity, rather than a quality, of evidence, and therefore determined that this section of the Federal APA specified a standard of proof, instead of a standard of judicial review. *Steadman*, 450 U.S. at 98, 101 S.Ct. at 1006. Based on this statutory language and its legislative history,

the Court held that a preponderance of evidence was the appropriate standard of proof in administrative hearings involving allegations of fraud. *Id.* at 102, 101 S.Ct. at 1007–08.

Arizona's APA has the same requirement of substantial evidence as set forth in the Federal APA. A.R.S. § 41–1062(A)(1) provides in pertinent part:

> Neither the manner of conducting the hearing nor the failure to adhere to the rules of evidence required in judicial proceedings shall be grounds for reversing any administrative decision or order providing the evidence supporting such decision or order is *substantial, reliable, and probative.*

(Emphasis added.) We interpret this language as the Supreme Court interpreted the comparable language in the Federal APA to require proof by a preponderance of the evidence in administrative hearings.

Culpepper argues that *Steadman* is distinguishable because, unlike the Federal APA provision interpreted in that case, 5 U.S.C. § 556(d), the Arizona APA provision, A.R.S. § 41–1062(A)(1), sets forth the scope of judicial review, not a standard of proof. We disagree.

In both 5 U.S.C. § 556(d) and A.R.S. § 41–1062(A), the term "substantial evidence" is used in the context of discussing the presentation of evidence *during* an administrative hearing. As the Supreme Court noted in *Steadman:*

> It is implausible to think that the drafters of the APA would place a scope-of-review standard in the middle of a statutory provision designed to govern evidentiary issues in adjudicative proceedings.

450 U.S. at 100 n. 20, 101 S.Ct. at 1007 n. 20. Additionally, both the Federal APA and Arizona's APA contain separate provisions governing the scope of judicial review. *See* 5 U.S.C. § 706(2)(E) and A.R.S. § 12–910. Like 5 U.S.C. § 702(2)(E), A.R.S. § 12–910 has been interpreted to require substantial evidence as the basis for an agency decision

---

6. The hearing officer noted that Culpepper, as the moving party, bore the burden of proof at the administrative hearing, pursuant to A.R.S. § 41–

1065, and Culpepper did not dispute the burden placed upon her.

upon judicial review. *Berenter v. Gallinger*, 173 Ariz. 75, 77, 839 P.2d 1120, 1122 (App. 1992). In light of the similarity in language in the Federal and Arizona APA provisions, and the placement of the language within a provision dealing with proceedings during a hearing, we reject Culpepper's contention that A.R.S. § 41–1062(A) governs standard of review. Rather, we find that § 41–1062(A) prescribes a standard of proof.

■ In conclusion, we hold that "absent legislative adoption of a different standard, an applicant's fraud in attempting to secure a license to practice [nursing] may be established by the same preponderance of the evidence standard generally applicable to contested cases under the APA." *Sobel v. Board of Pharmacy*, 130 Or.App. 374, 882 P.2d 606, 610 (1994). The Board applied the correct standard of proof in this case.

### III. The Board's Denial of Culpepper's License was not an Excessive Penalty.

Culpepper contends that the Board's denial of her license application was an excessive penalty. She claims that given the "equivocal nature of the evidence" and the lack of danger she posed to the public, the Board should have allowed her to immediately retake the examination.

■ An administrative penalty is excessive only if it is so "disproportionate to the offense as to shock one's sense of fairness." *Schillerstrom v. State*, 180 Ariz. 468, 471, 885 P.2d 156, 159 (App.1994). We will not disturb the penalty imposed by an administrative body unless there has been a clear abuse of discretion. *Taylor v. Arizona Law Enforcement Merit Sys. Council*, 152 Ariz. 200, 207, 731 P.2d 95, 102 (App.1986).

■ We agree with the trial court's conclusion that the Board did not abuse its discretion in denying Culpepper's license. In spite of Culpepper's characterization of the evidence regarding cheating as "equivocal," we believe, as discussed in detail above, that substantial evidence supported the Board's findings and decision on this issue. The legislature has specifically authorized the Board to deny licensure if the Board con-

cludes that an applicant has attempted to obtain his or her license by means of fraud or deceit or other unprofessional conduct. *See* A.R.S. §§ 32–1663(A) and –1601(10)(a). Accordingly, the Board acted within its authority when it denied Culpepper's license application.

Furthermore, the Board's decision does not forever preclude Culpepper from obtaining an Arizona registered nurse license. Under A.A.C. R4–19–404, Culpepper may reapply for her registered nurse license after two years have passed from the date of the Board decision. The Board issued its final order of denial in this case on August 24, 1994; therefore, Culpepper may seek licensure again this year. In light of these circumstances, the Board's denial of Culpepper's registered nurse license neither "shocks the conscience," nor constitutes an excessive penalty.

### IV. The Superior Court Properly Assessed Costs Against Culpepper.

Culpepper disputes the superior court's award of $1,658.00 in costs to the Board pursuant to A.R.S. § 12–912. The award encompassed $1,583.00 for court reporting charges and $75.00 for paralegal services. Culpepper contends that neither charge is an allowable cost under the statute.

A.R.S. § 12–912 provides:

Costs may be awarded defendant agency if a judgment adverse to the plaintiff is rendered. Such costs may be awarded in an amount deemed reasonable by the trial court, based upon the expense the defendant agency has incurred in preparing the record of the proceedings before trial.

Culpepper contends that the only thing required to prepare the record for review by the trial court was the copying and certification of the administrative record. Culpepper asserts that the court reporting charges were not incurred by the Board as part of preparing the administrative record for trial because the hearing proceedings had been transcribed months before Culpepper even filed her superior court complaint. She further asserts that paralegal charges are not an allowable cost and that the Board has not

established that any paralegal charges were actually incurred in preparing the administrative record submitted to the trial court.

We find such costs recoverable under the statute. The court reporting costs were incurred as a direct result of Culpepper's challenge of the Board's initial denial of her license, her request for a hearing, and her subsequent request for judicial review of the Board's final decision.[7] The administrative proceedings were transcribed to enable the superior court to determine whether substantial evidence existed to support the Board's decision—an issue raised by Culpepper. Although no Arizona case has discussed the recovery of transcript costs under A.R.S. § 12–912, we find a decision of the California Supreme Court interpreting similar statutory language persuasive. In *Ralph's Chrysler–Plymouth v. New Car Dealers Policy & Appeals Bd.*, 8 Cal.3d 792, 106 Cal.Rptr. 169, 505 P.2d 1009 (1973), a car dealer was required by statute to provide the agency with a transcript of the administrative hearing and thereby incurred the transcript cost *before* he sought judicial review. *Id.* 106 Cal. Rptr. at 170, 505 P.2d at 1010. When the dealer prevailed in the trial court, the court awarded the dealer the costs it had incurred in preparing the transcript pursuant to a California statute authorizing the award of costs to the prevailing party in such actions. The agency objected, arguing, like Culpepper, that the costs were incurred prior to the trial court action and therefore not recoverable. The California Supreme Court rejected this argument, stating:

> The [statute] makes no exception for costs incurred prior to filing the petition for [judicial review]. The [statute] makes absolutely no reference to when the expense must be borne, and there seems to be no reason to penalize a successful petitioner merely because a transcript was prepared during a trial, or prepared in the course of

the administrative process so long as the transcript was essential to review and its cost allowable under the language of the applicable statute.

*Id.* at 171, 505 P.2d at 1011. (Footnote omitted.)

Like the California statute at issue in *Ralph's,* A.R.S. § 12–912 contains no exception for costs incurred at an earlier stage in the administrative process.[8] Because the transcript was essential to the superior court's review, the Board may recover the costs incurred in preparing it.

As for the paralegal services, the Board's Statement of Costs and accompanying affidavit of Board Executive Director Fran Roberts state that these charges arose from a paralegal's work in preparing the administrative record for submission to the superior court. Culpepper has not provided us with any reason to question the validity of this statement, nor has she raised any issue regarding the reasonableness of the costs awarded. Accordingly, we find the costs encompassed by the statute and properly awarded by the superior court.

## CONCLUSION

The Board's decision was supported by substantial evidence. Its denial of Culpepper's license was not an excessive penalty, and the Board applied the correct standard of proof in the administrative proceedings. Accordingly, the superior court properly affirmed the Board's decision. Further, the superior court properly assessed costs against Culpepper. We affirm the decision of the superior court.

GERBER, P.J., and VOSS, J., concur.

---

7. A portion of the transcription costs arose not from the transcription of the 3–day hearing, but from the transcription of the Board hearings reviewing the hearing officer's findings and recommendation and considering Culpepper's motion for a rehearing. These latter hearings were transcribed not for the Board's benefit, but solely for the judicial proceedings initiated by Culpepper.

8. The only time limitation in the statute is one authorizing the recovery of costs incurred in preparing the record of the proceedings "before trial." A.R.S. § 12–912. Here, the costs for transcribing the administrative record were incurred "before trial."