NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JOHN DOE,
*Plaintiff/Appellant*,

*v.*

ARIZONA BOARD OF REGENTS,
*Defendant/Appellee*.

No. 1 CA-CV 18-0784
FILED 12-24-2019

Appeal from the Superior Court in Maricopa County
No.  LC2017-000365-001
The Honorable Patricia A. Starr, Judge

**AFFIRMED IN PART; VACATED IN PART; REMANDED**

COUNSEL

Hagens, Berman, Sobol, Shapiro, LLP, Phoenix
By Robert B. Carey, Leonard W. Aragon
*Counsel for Plaintiff/Appellant*

Cohen, Dowd, Quigley, PC, Phoenix
By Rebecca L. van Doren, Daniel G. Dowd
*Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

**J O H N S E N**, Judge:

¶1 John Doe ("Respondent") appeals from the superior court's judgment affirming the decision by Arizona State University to expel him for violating the Arizona Board of Regents' Student Code of Conduct. Although we affirm ASU's finding that Respondent violated the Code by serving alcohol to a minor, its finding that he engaged in sexual misconduct is not supported by substantial evidence. Accordingly, we affirm in part, vacate in part and remand so that ASU may reconsider an appropriate sanction.

**FACTS AND PROCEDURAL BACKGROUND**

¶2 "[W]e view the evidence in a light most favorable to upholding the [agency's] decision." *Baca v. Ariz. Dep't of Econ. Sec.*, 191 Ariz. 43, 46 (App. 1997). Respondent, a male ASU student, invited Complainant, a female ASU student, to a small social gathering at a friend's home. There, Complainant drank a substantial amount of alcohol. At some point, according to Complainant, Respondent and another male ("Participant") led her to a bedroom, undressed her, put her on the bed and had sex with her. The following afternoon, Complainant reported the incident to the Tempe Police Department and underwent a Sexual Assault Examination Report ("SANE") examination. Although Tempe police eventually referred the case to the Maricopa County Attorney's Office for a charging decision, no criminal charges were brought against Respondent.

¶3 Five months after the incident, Complainant filed a report with the ASU Police Department, which forwarded it to the ASU Dean of Students Office. The Dean of Students Office notified Respondent it had received a report that he "provided alcohol to a minor female student" and "[a]fter she became heavily intoxicated, [Respondent] and another male took her to a room . . . where [they] engaged in oral and vaginal sex without her consent." Based on those allegations, the Dean of Students Office

accused Respondent of violating Code § F(15) (furnishing alcohol to underage person) and § F(23) (sexual misconduct).[1]

¶4 Following an investigation, the Dean of Students Office notified Respondent that "[o]ur review has determined that it was more likely than not that you engaged in non-consensual sexual activity with a woman whom you were aware was incapacitated, making her unable to provide consent." The Dean of Students Office found Respondent responsible for violating Code §§ F(15) and F(23) and ordered him expelled. Respondent requested a hearing by the University Hearing Board ("Board"), which makes recommendations in such matters to the ASU Senior Vice President for Educational Outreach and Student Services, James Rund, who is the final decision-maker. At the ensuing hearing, ASU's representative – the Dean of Students Office – had the burden of proving by a preponderance of the evidence that Respondent violated the Code.

¶5 Although the Dean of Students Office had accused Respondent of violating Code § F(23) by engaging in sex with Complainant when she was incapacitated and therefore unable to consent, after the hearing, the Board concluded it was unable to determine whether Complainant was "incapacitated and thus was unable to provide consent." In describing the conflicting evidence on that issue, the Board noted that at the time of the incident, "Complainant was lucid and able to verbally communicate." Nevertheless, the Board found Respondent violated § F(23) by engaging in "sexual contact . . . perpetrated against a person by force." Code § E(20)(a).[2] It also concluded Respondent violated § F(15) by distributing alcohol to Complainant because she was underage. The Board recommended expulsion.

¶6 Rund accepted all the Board's factual findings and its determination that Respondent violated § F(23) by engaging in sexual contact by force, as well as the Board's findings and recommendations on the alcohol charge under § F(15). But Rund rejected the Board's conclusion that the evidence did not prove incapacitation. Instead, Rund found Complainant was incapacitated and Respondent knew she was incapacitated. Finally, Rund upheld the sanction of expulsion. Respondent submitted a Request for Review and Rehearing, which Rund denied. In

---

[1] Absent material revision after the relevant date, we cite the current version of a statute or rule.

[2] Although this provision was relocated from Code § E(17)(a) to § E(20)(a) since the relevant date, its text has not changed.

denying Respondent's request, Rund elaborated on his reasoning regarding incapacitation and cited additional evidence in support of his decision.

¶7        Respondent sought review of the decision in superior court. The court affirmed ASU's decision, concluding it was supported by substantial evidence and was not arbitrary, capricious, contrary to law or an abuse of discretion.  Respondent timely appealed.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2019) and -913 (2019).[3]

## DISCUSSION

¶8        We will affirm an agency's decision unless it "is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion."  A.R.S. § 12-910(E) (2019).  "We defer to the agency's factual findings if they are supported by substantial evidence, even if other evidence before the agency would support a different conclusion." *Waltz Healing Ctr., Inc. v. Ariz. Dep't of Health Servs.*, 245 Ariz. 610, 613, ¶ 9 (App. 2018).  "[W]e review questions of law de novo." *Raven Rock Constr., L.L.C. v. Bd. of Supervisors of Maricopa County*, 207 Ariz. 135, 138, ¶ 9 (App. 2004).

## A.    The Student Code of Conduct.

¶9        Section F(23) of the Student Code of Conduct prohibits "[s]exual misconduct," defined, in relevant part, as "[s]exual violence and other non-consensual sexual contact – actual or attempted physical sexual acts perpetrated against a person by force or without consent."  Code § E(20)(a).  In turn, § E(4) defines "[c]onsent" as the following:

"Consent" in the context of sexual activity means informed and freely given words or actions that indicate a willingness to participate in mutually agreed upon sexual activity.

Consent may not be inferred from: 1) silence, passivity or lack of resistance, 2) a current or previous dating or sexual

---

3        Although § 12-913 expressly allows a party to appeal to the "supreme court," we have construed this provision as "also allowing an appeal to the court of appeals, which was created after § 12-913 was enacted." *Svendsen v. Ariz. Dep't of Transp., Motor Vehicle Div.*, 234 Ariz. 528, 533, ¶ 13 (App. 2014).

relationship, 3) acceptance or provision of gifts, meals, drinks, or other items or 4) previous consent to sexual activity.

Consent may be withdrawn during sexual activity. Consent to one form of consensual sexual activity does not imply consent to any other form of sexual activity.

Consent may not be obtained through physical force, violence, duress, intimidation, coercion, or an express or implied threat of injury.

Consent may never be given by a person who is: incapacitated (by drugs, alcohol or otherwise), unconscious, asleep, or otherwise physically or mentally unable to make informed, rational judgments. The use of alcohol or drugs does not diminish one's responsibility to obtain consent and does not excuse conduct that violates this Student Code of Conduct.

Code § G(1) provides that the Dean of Students "may impose" sanctions, including expulsion, "for any violation of the Student Code of Conduct."

**B.      Rund's Findings and Conclusions Regarding Incapacitation.**

**¶10**          Respondent argues substantial evidence does not support Rund's finding that Complainant could not consent to the sex because she was incapacitated. "'Substantial evidence' is defined as any 'relevant evidence from which a reasonable mind might draw a conclusion.'" *Troutman v. Valley Nat'l Bank of Ariz.*, 170 Ariz. 513, 518 (App. 1992) (quoting *In re Estate of Mustonen*, 130 Ariz. 283, 285 (App. 1981)). "In reviewing factual determinations by an administrative agency, this court does not reweigh the evidence or substitute its judgment for that of the agency." *Culpepper v. State*, 187 Ariz. 431, 436 (App. 1996). "If two inconsistent factual conclusions could be supported by the record, then there is substantial evidence to support an administrative decision that elects either conclusion." *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336 (App. 1984) (citation omitted).

### 1.      "Incapacitation" as it relates to consent to sexual conduct.

**¶11**          The Code does not define "incapacitated" or "incapacitation," but states that in "interpreting words and phrases not otherwise defined," "every day [sic] and common usages and understanding shall apply, and external sources may be consulted for guidance." Code § A(4). Examining the text of § E(4), the Code provision defining consent, *see supra* ¶ 9, we infer

that a person is incapacitated when he or she is "otherwise physically or mentally unable to make informed, rational judgments." *See Pawn 1st, L.L.C. v. City of Phoenix*, 231 Ariz. 309, 312, ¶ 18 (App. 2013) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) (under "series-qualifier" canon of interpretation, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series")).

¶12        As applied here, in considering whether ASU proved Complainant was "unable to make informed, rational judgments," we examine whether the evidence supported the conclusion that she was unaware of the nature and consequences of her decision to engage in sexual activity with Respondent on the night in question or was unable to consciously exercise her personal will to decide to do so. *See Incapacitated Person*, Black's Law Dictionary (11th ed. 2019) ("someone who is impaired by an intoxicant, by mental illness or deficiency, or by physical illness or disability to the extent that personal decision-making is impossible").

¶13        As acknowledged by Kendra Hunter, ASU's chief witness concerning its investigation, the issue of incapacitation is not whether, in hindsight, the person made a *smart* decision. Instead, it is whether the person had the cognitive ability at the time to make the decision for herself or himself. Put differently, a "rational judgment" in this context is not one that an observer would deem a "good judgment" but instead is one made by a person who is able to comprehend the nature and consequences of the matter. *See State v. Gunter*, 132 Ariz. 64, 71 (App. 1982) (when defendant argued he was impaired by medication when he consented to plea agreement, the result would turn in part on whether he had the "ability to make a rational judgment and understand the consequences of his plea"); *Palumbo v. Norstar Bank Upstate N.Y.*, 622 N.Y.S.2d 263, 264 (App. Div. 1995) (person not incapacitated when "he comprehended the nature and consequences of his actions and made a rational judgment" to enter settlement).

¶14        Moreover, as Hunter also acknowledged, there is a difference between being under the influence of alcohol and being incapacitated. A person who is intoxicated may or may not be incapacitated for purposes of the Code. Here, the issue was whether the alcohol Complainant had consumed rendered her incapacitated and therefore unable to consent to sex with Respondent on the night at issue.

## 2. Evidence bearing on incapacitation.

¶15 In his initial decision after receiving the Board's Findings and Recommendations, Rund cited evidence of the number of shots Complainant had drunk and her purported inexperience with alcohol. He also credited Complainant's testimony that she was "extremely drunk," could not stand up straight and needed to support herself against a wall. As Rund noted, Complainant also testified that while inside the bedroom, she felt like she was going to throw up and was "concentrating hard on not blacking out." Rund also cited Complainant's statements to police that she "didn't know what was going on" and "was so intoxicated that she was unable to move or try to physically prevent the incident while it was occurring." Finally, Rund also noted another witness's account that after Complainant left the bedroom where the sex had occurred, she was "really drunk" and "needed help standing up."

¶16 In his later ruling denying Respondent's Request for Review and Rehearing, Rund cited additional evidence that he found supported his conclusion. As in his initial decision, Rund relied nearly exclusively on Complainant's own statements, rather than accounts by other witnesses, in concluding that "the weight of the credible evidence leads to the conclusion that it is more likely than not that the Complainant was incapacitated by alcohol to the point that she was unable to make informed, rational judgments."

¶17 A careful review of the record, however, focusing in particular on other statements by Complainant about the incident, shows that ASU failed to prove she lacked the capacity to make an informed choice to engage in sex with Respondent on the night in question. Rund's findings to the contrary are simply unsupported by substantial evidence.

¶18 There is no question that Complainant had consumed a considerable amount of alcohol before she entered the bedroom with Respondent and Participant – by her own account, she had drunk seven shots in the 90 minutes before. She rated her impairment at "8/9 out of 10" and said she needed to lean against the wall of the hallway leading into the bedroom because she was not stable on her feet. She also testified she felt close to blacking out and vomiting. The record, however, belies Rund's conclusion that Complainant was so intoxicated that she could not make an informed, reasoned choice to enter the bedroom and engage in sexual activity with Respondent and Participant.

¶19　　　　To begin with, although Complainant responded "[y]es" to questions about whether the sex occurred while she was incapacitated, no one else from the gathering testified Complainant was incapacitated on the night in question. Although Complainant testified she needed to use the wall to steady herself to walk, no one else testified she was stumbling before she entered the bedroom. No witness testified she was asleep or passed out. No other witness testified she was unable to communicate. No one testified she was even slurring her words before she entered the bedroom.

¶20　　　　As noted, in finding Complainant must have been incapacitated, Rund relied not on the accounts of other witnesses, but instead accepted at face value Complainant's statements that she did not know what was going on and that "she was too intoxicated to stop [Respondent and Participant] physically or even tell them to stop." But Complainant's own accounts of what went on in the bedroom disprove her after-the-fact characterizations of her mental and physical state at the time.

¶21　　　　As for whether Complainant knew what was going on, although Rund cited her testimony that she could not remember how she became undressed in the bedroom, Complainant recounted what happened in the bedroom in great detail to police the next afternoon and again during the hearing. As the Board concluded, based on the same evidence considered by Rund, "[a]ccounts of the encounter provided by all parties indicate that the Complainant was lucid and able to verbally communicate." Complainant described the arrangement of the furniture in the room, the bed and even the color of the sheets and the color of Participant's shirt. She knew that as the sex began, Participant was positioned in back of her and entered her from behind. She knew that neither Respondent nor Participant wore a condom. She knew that neither of them ejaculated. She even remembered that Respondent asked her to allow Participant to ejaculate, and she refused. She told police she remembered that at one point during the encounter, Participant pulled out his cellphone and began taking pictures, and she told him to stop. She remembered that when the vaginal sex became painful because she was not aroused, she told Respondent and Participant to stop. She remembered that as they remained in the bedroom after the sex ended, Respondent called her "dramatic," she called him "an asshole," then he responded, "No you're an asshole." And finally, even though she was not familiar with the home, Complainant was able to dress

herself after the sex ended and then find her way to another bedroom to rouse her friend ("Girlfriend") so they could leave.[4]

¶22            Nor, contrary to Rund's findings, is there evidence to support Complainant's assertion that she was too intoxicated to stop the sex from happening, to say the words "I don't want to have sex" or to "tell [Respondent and Participant] to stop."  Complainant told police and testified that she engaged in simultaneous sexual conduct with Respondent and Participant.  By her own account, she was on her hands and knees, "dogg[y] style," and performed oral sex on one male's penis while the other male penetrated her from behind with his penis. The sex went on for 20-25 minutes, during which she remained on all fours, long enough to develop bruises on both knees.  From time to time, the males switched positions to allow oral sex with the other male while the second male entered her from behind.

¶23            On this point, Respondent offered testimony by Cindi Nannetti, who retired in 2014 from the Maricopa County Attorney's Office after more than 32 years prosecuting sex crimes and sexual assaults.  Rund did not address Nannetti's expert testimony, which sharply called into question Complainant's account that she was so drunk that she could not stand without support:

> [O]ne of the other key things is that if somebody is so incapacitated that the complainant says that she had to use the wall to go down the hall, I don't know how somebody would maintain a doggy-style-type position for 20, 25 minutes if she's so incapacitated, why you wouldn't just fall down, and be able to do that while having vaginal and oral sex.

¶24            In sum, the undisputed evidence of what happened in the bedroom is that Complainant was not too intoxicated to actively participate in at least 20 minutes of strenuous sex.  The same evidence also disproves

---

[4]      The Board chose not to credit any statements by Complainant or Respondent during a "one party consent call" Complainant made after the fact at the suggestion of police.  We likewise conclude those statements are entirely unreliable.  As Complainant testified, that call was "staged" and both parties made admittedly false or misleading statements during the call.

her contention that she was too intoxicated to decline to participate in the sex at the outset.

¶25 Nor does the evidence support Rund's conclusion that Complainant lacked the capacity to say no. At the hearing, Complainant testified she was not able to say the words, "I don't want to have sex." To the contrary, the evidence is undisputed that at some point during the sexual encounter, she did tell Respondent and Participant to stop – and they did.[5] Complainant also noticed that Participant was taking pictures with his cellphone and told him to stop doing so. Further, Complainant testified she was "more drunk going out of the room than [she] was going in." The only reasonable conclusion to be drawn from that admission is that if she was able to say she wanted to stop after some 20-25 minutes of sex, even though she was "more drunk" at the end than when the sex began, she had the capacity to say no in the beginning. Even the manner in which she described how she told the males to stop implies that she earlier had the capacity to consent to sex: She testified that when Respondent asked her if Participant could continue with the sex long enough to ejaculate, she responded, "no, I don't want to do this anymore."[6]

¶26 At oral argument, ASU argued evidence that Complainant may have made rational, informed judgments at the end of the encounter does not undermine the conclusion that, at a minimum, she was incapacitated at the outset. But the record belies any contention Complainant was incapacitated when the sex began. First, Complainant herself told police she was "coherent" at the time she entered the bedroom. In addition, as noted, after the fact she was quite capable of reporting specific details about the beginning of the encounter: She told police that (1)

---

[5] Complainant told police and testified at the hearing that the vaginal contact grew uncomfortable for her because she was not aroused. As the police report recounted, "[Complainant] said she started crying and she told them to stop because it was hurting."

[6] Inexplicably, Rund based his decision in part on his finding that Respondent "has no credible explanation for why [Complainant] ended [the encounter] abruptly, started crying, and left the room." It was not Respondent's burden to prove why the sexual conduct ended, but, as noted, *see supra* ¶ 25, n.5, Complainant testified she ended the encounter because it had become painful. By Complainant's account, after she began to cry because of the pain, Respondent behaved rudely – he called her "dramatic" and they exchanged insults. None of that evidence shows Complainant was incapacitated when the sex began.

Participant and Respondent undressed her and then undressed themselves, (2) she was on all fours, (3) Participant first had vaginal sex with her while Respondent had oral sex, and that they switched, and (4) neither male wore a condom.

¶27        Rund found it compelling that, by Complainant's account, she had rejected an earlier attempt by Respondent to have sex with her that evening.  As Rund put it, "I do not find it plausible that the Complainant would tell the Respondent she did not want to sleep with him and then subsequently and with no explanation agree to participate in intercourse with not just Respondent, but also with [Participant].  The only variable in circumstances was Complainant's consumption of seven shots of [v]odka."

¶28        Nothing in the evidence, however, shows that the vodka rendered Complainant incapable of deciding to change her mind.  As Complainant acknowledged, when she and Respondent first spent time together a couple of days before the gathering, she initially declared to him that they would not have sex, but then – free of any influence of alcohol – she willingly engaged in oral sex with him.[7]

¶29        Finally, Rund characterized the three-way encounter in the bedroom on the night in question as "outrageous behavior," and from that concluded Complainant would have participated only if she was incapacitated.  But Hunter, the witness ASU called to testify about its investigation, testified that a reasonable person exercising free will could decide to participate in a "threesome."

¶30        In sum, a handful of statements by Complainant are the only evidence in the record supporting the conclusion that she was so drunk that she was incapacitated on the night in question.  But other statements by Complainant – statements she made to police and under oath at the hearing

---

[7]        The relevance of this evidence is not that Complainant's consent to oral sex with Respondent a few days before shows that she consented to oral and vaginal sex with Respondent and Participant on the night in question.  *See* Code § E(4) ("Consent may not be inferred from . . . previous consent to sexual activity.").  It is that on the earlier occasion, when she had not been drinking, Complainant apparently changed her mind about whether to engage in sexual conduct with Respondent.  If she exercised her independent judgment to change her mind and engage in sexual conduct on the earlier occasion, it can hardly be said to be "[im]plausible" that she could not exercise her independent judgment to change her mind on the later occasion.

– along with undisputed other evidence, entirely disprove her bare assertions that she was incapacitated. On appeal, Respondent vigorously contests Rund's findings, pointing to his own testimony and that of other witnesses who saw Complainant that night. We reach our conclusion without weighing the testimony of other witnesses against that of Complainant.

¶31 Based solely on undisputed accounts of the events that night and on statements by Complainant that are entirely inconsistent with those on which Rund relied, we conclude the evidence at the hearing could not lead a reasonable mind to conclude ASU proved Complainant was unable to make "informed, rational judgments" on the night in question. Code § E(4); *see also Troutman*, 170 Ariz. at 518. Because we conclude Rund's finding that Complainant was incapacitated is not supported by substantial evidence, his conclusion that Respondent violated Code § F(23) because Complainant was incapacitated was an abuse of discretion. *See* A.R.S. § 12-910(E); *Torres v. N. Am. Van Lines, Inc.*, 135 Ariz. 35, 40 (App. 1982) (abuse of discretion is "discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons").[8]

## C.   Rund's § F(23) Findings and Conclusions Regarding Force.

¶32 Relying on Complainant's statements and various accounts of her injuries from the encounter, the Board found that Respondent "engaged the Complainant by force," and Rund adopted this finding without modification. Respondent argues Rund's finding is not supported by substantial evidence.

¶33 We conclude the finding that Respondent engaged in sex with Complainant by force was not supported by substantial evidence because a reasonable mind could not reach that conclusion based on the evidence. *See Troutman*, 170 Ariz. at 518.

¶34 In the first place, there was no evidence that Complainant ever asserted that Respondent and Participant used violence, threats, intimidation or weapons to compel her to have sex with them. Indeed, Complainant told police "she was not held down or threatened to stay in

---

[8] Because we conclude Rund's incapacitation finding lacks substantial evidence, we do not address Respondent's argument that Rund improperly rejected the Board's credibility findings; nor do we address Rund's conclusion that Respondent was aware that Complainant was incapacitated.

the room." Although Complainant answered "[y]es" to the SANE examiner's question of whether there was "any use of force," when asked to "[d]escribe," Complainant only answered that "I was really intoxicated." She answered "[n]o" when asked whether threats, intimidation or weapons were used.

¶35 In the absence of any allegation by Complainant that Respondent used force to compel her to have sex, Rund relied on the Board's citation of her statement to ASU that while having sex with the two males, she wanted "to throw-up [sic] because . . . they were pushing on her gag reflexes with their penises." (Ellipses in original.) This statement does not demonstrate or even suggest that Respondent forced Complainant to have sex with him, and neither the Board nor Rund attempted to explain how it might evince the conclusion that the sex was forced rather than merely vigorous. In addition, in recounting Complainant's statement, the Board omitted three relevant words from Complainant's full statement. The ASU investigation reported Complainant's statement as follows: "[Complainant] stated she remembers wanting to throw-up [sic] because *she was drunk* and they were pushing on her gag reflexes with their penises."

¶36 Second, Rund relied on Complainant's statement to the ASU investigator that "[t]he pain was caused because [Respondent] and [Participant] were not using condoms or lube, and she was dry." Along the same lines, Complainant testified that the SANE nurse told her she had a "very large bruise in my vagina due to *them having sex with me and me not being ready*." (Emphasis added.) But those statements do not suggest Respondent forced Complainant to have sex. The self-described cause of Complainant's pain was not force, but the males' failure to use condoms and lubrication. The same holds true for other statements regarding Complainant's pain and crying during the encounter: Complainant told police she "started crying and she told them to stop because it was hurting," and Participant told police that "after a while [sic], [Complainant] started to say that it was hurting" and "[o]nce [Complainant] said it was hurting, they all stopped having sex." Although this evidence does not describe a comfortable sexual experience, it does not support the conclusion that Respondent used force to compel Complainant to have sex.

¶37 Third, the final category of evidence on which Rund relied, accounts of Complainant's injuries from the encounter, likewise does not evince a forcible sexual attack. Although Complainant texted Girlfriend that the SANE nurse "said I have a lot of abrasions on my vagina and a lot of big ones" and "it looked really tender," the actual SANE report concluded she suffered only a "[m]inor physical injury by exam," a "[m]inor genital

injury by exam," and "[e]vidence of penetration of the vulva by exam." And Nannetti, the only expert witness at the hearing with experience in sexual-assault investigations, agreed with the proposition that the SANE report's diagnosis of only minor injuries did not "indicate anything other than a consensual sexual encounter." Viewing these injuries in light of Complainant's account that she participated in oral and vaginal sex while on all fours for 20-25 minutes, along with the absence of condoms and lubrication, *see supra* ¶¶ 21-24, 35, her injuries cannot reasonably be a basis on which to conclude Respondent used force to compel her to have sex.

**¶38** In sum, Rund's finding that Respondent had sex with Complainant by force is not supported by substantial evidence. Thus, Rund's conclusion that Respondent violated Code § F(23) by "engaging in sexual acts against the Complainant by force" was an abuse of discretion. *See* A.R.S. § 12-910(E); *Torres*, 135 Ariz. at 40.[9]

### D. Rund's § F(15) Findings and Conclusions Regarding Distribution of Alcohol.

**¶39** Respondent argues there is no substantial evidence to support Rund's finding that Respondent provided alcohol to Complainant. The Board found that Respondent "admit[ted] that he distributed alcohol to the Complainant, who [was] underage." Rund accepted the Board's findings and recommendations on that charge.

**¶40** Code § F(15) prohibits "[v]iolation of the Board or university rules or applicable laws governing alcohol, including consumption, distribution, unauthorized sale, or possession of alcoholic beverages." In turn, ASU's Student Services Manual § 106-03 states that "[n]o person . . . may sell, furnish, or give alcoholic beverages to any person under the age of 21, except as otherwise permitted by law." *Student Services Manual (SSM)*, Arizona                                      State                                      University,

---

[9] Because we reverse Rund's decision concerning use of force, we need not consider Respondent's argument that ASU deprived him of due process by failing to provide adequate notice of that charge. Further, because we conclude substantial evidence does not support Rund's finding that Respondent violated § F(23), we need not consider Respondent's contentions that ASU made these findings without defining "force" and "incapacitation" and that we should interpret these terms according to the guidelines of the Association of Title IX Administrators.

https://www.asu.edu/aad/manuals/ssm/ssm106-03.html (last updated July 1, 2018).

**¶41** Substantial evidence supports Rund's finding that Respondent provided alcohol to Complainant when she was underage. Complainant testified at the hearing that she was 19 at the time of the incident and Respondent provided alcohol to Complainant by "pour[ing] shots." Respondent also testified he "just poured her a shot" to play a drinking game. For these reasons, Rund's conclusion regarding the § F(15) charge was not contrary to law, arbitrary, capricious or an abuse of discretion. *See* A.R.S. § 12-910(E).

**¶42** Respondent, however, argues Rund's finding that Respondent "distributed" alcohol to someone underage was contrary to law, arbitrary, capricious and an abuse of discretion because ASU did not argue "distribut[ion]" but rather that Respondent "provided, gave, received, or influenced Complainant's alcohol consumption," thus changing the applicable standard.

**¶43** We are not persuaded. As noted above, *supra* ¶ 11, "[f]or purposes of interpreting words and phrases not otherwise defined in the [Code], every day [sic] and common usages and understanding shall apply, and external sources may be consulted for guidance." Code § A(4). To "distribute" alcohol at a social gathering has the same "every day [sic] and common" meaning as to "give" or "provide" alcohol in the context of pouring shots for another person. We need not address whether Respondent "influenced Complainant's alcohol consumption" because neither the Board nor Rund relied on that language in deciding Respondent violated § F(15).

## E. ASU's Investigation.

**¶44** Respondent argues ASU deprived him of due process by failing to conduct a fair and impartial investigation. Specifically, Respondent argues the ASU investigator told Complainant it was "up to [Complainant] to submit information instead of [the investigator] being able to go get it," while telling Respondent ASU would conduct a "'fair and impartial' investigation" by a "'neutral, third-party investigator' whose responsibility was to 'collect information'"; he argues this "deception enabled Complainant to direct the course of the investigation" and deterred Respondent from gathering and presenting exculpatory evidence. He also argues ASU violated due process by denying him the opportunity to cross-

examine the ASU investigator and by refusing to compel Girlfriend to testify at the hearing.

¶45 Respondent, however, does not argue his defense of the alcohol charge was prejudiced by the purported due-process violation. *See Bills v. Ariz. State Bd. of Educ.*, 169 Ariz. 366, 369 (App. 1991) (no due-process violation where no prejudice occurred). He does not identify what evidence he would have sought or presented to contest ASU's allegation he provided alcohol to Complainant. Indeed, Respondent admitted at the hearing he provided Complainant alcohol, and it is uncontested Complainant was underage at the time.[10] Because we have found the sexual misconduct charge was not supported by substantial evidence and Respondent does not argue a failure of due process prejudiced his defense of the alcohol charge, we decline to address Respondent's remaining due-process arguments.

## CONCLUSION

¶46 Because Rund's findings concerning force and incapacitation are not supported by substantial evidence, he abused his discretion by concluding Respondent violated the Student Code of Conduct § F(23). By contrast, Rund's findings on the § F(15) alcohol violation are supported by substantial evidence and his conclusion on that charge was not contrary to law, arbitrary, capricious or an abuse of discretion. *See* A.R.S. § 12-910(E). Accordingly, we vacate the superior court's judgment upholding

---

[10] For the same reason, we reject Respondent's contention that he was deprived of due process by the Board's decision to limit the hearing to a single day. *See Bills*, 169 Ariz. at 369.

Respondent's expulsion from ASU and remand to ASU to redetermine the appropriate sanction for Respondent's sole remaining Code violation under § F(15). *See* Code § G(1) (outlining available sanctions). We grant Respondent his costs on appeal, but reject his request for attorney's fees, which is unsupported by any relevant statutory authority.



AMY M. WOOD • Clerk of the Court
FILED: AA